IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,     §
                                   §
               Plaintiff,   §
                                   § Criminal No. 3:09-CR-103-D(01)
VS.                                    §
                                   §
JOHN PATRICK NEWTON,        §
                                   §
               Defendant.   §

MEMORANDUM OPINION
AND ORDER

Defendant John Patrick Newton ("Newton") moves to suppress all evidence——including drugs, drug paraphernalia, a digital scale, U.S. currency, cellular telephones, notes, a ledger, keys, and an airplane boarding pass——seized during a series of searches (most of which was seized pursuant to warrants). Newton contends that warrants supporting some of the searches were invalid (including under *Franks v. Delaware*[1]); that the residential homeowner's consent to search the room in which Newton stayed periodically while in the Dallas area was ineffective; and that certain searches must be suppressed as fruit of an initial, illegal search. Following a hearing, and for the reasons that follow,[2] the court grants the motion to a limited extent (as to the keys and airline boarding pass) and otherwise denies the motion.

---

[1]*Franks v. Delaware*, 438 U.S. 154 (1978).

[2]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

I

A

The chain of events that culminated in the searches and seizures that produced evidence of Newton's marihuana distribution activities began the early morning hours of May 30, 2008.  At about 2:40 a.m., Irving Police Department ("IPD") officers Ricardo Garza ("Officer Garza") and Eric Chavez ("Officer Chavez") were dispatched to the Winsted Apartments in Irving.  An apartment resident ("complainant") who lived in unit 2032 was complaining of the strong smell of marihuana emanating from unit 1032, which was situated directly below unit 2032.

Upon arriving, Officer Garza spoke to the complainant, who advised that there was a lot of vehicle traffic connected with unit 1032; he had been able to smell burnt marihuana in his unit for about one or two days; and he believed the person who lived in unit 1032 was selling drugs.  The complainant also advised Officer Garza that, as he was standing on his balcony a few nights before, he overheard someone in the vicinity refer to being "coked up." Officer Garza also smelled what he thought to be fresh (not burnt) marihuana.  The complainant appeared to Officer Garza to be credible.

After Officer Garza finished talking with the complainant, he approached unit 1032.  Because he was not familiar with the Winsted Apartments (Officer Garza testified that it was unusual for IPD

- 2 -

officers to be summoned there), Officer Garza wanted to observe unit 1032 and get background information (e.g., the size of the apartment and the number of occupants) before knocking on the door. Officer Garza was concerned about officer safety because he believed he was dealing with narcotics, which could involve firearms and violence.

The front door to unit 1032 was located on the left side, as the unit was viewed from the street.  To the right of the door was a window.  In front of the window was small shrubbery.  To the right of the window was a chimney.  To the right of the chimney was another window (the "window").  The window was covered by closed metallic blinds that had been drawn to the bottom.  In front of the window was some type of ground cover (not grass), but the window area was accessible to anyone.[3]  To the right of the window was a patio enclosed by a small wall.

As Officer Garza approached unit 1032, he immediately noticed a strong smell of fresh marihuana.  He performed a brief visual inspection of the outside of the apartment and then walked up to the window.  Without manipulating anything, Officer Garza peered with his right eye into unit 1032 through an approximately 1" gap between the blinds and the right-hand window frame.

---

[3]Newton maintained during the hearing that bushes were planted in front of this window.  Officer Garza testified that the photograph of the apartment that the government introduced shows bushes elsewhere in front of the apartment, but not in front of this window.

Officer Garza observed a person (Newton) standing in the kitchen holding large black plastic bags that Officer Garza believed contained marihuana. As Officer Garza watched, Officer Chavez knocked on the door, identifying himself as a police officer. Newton responded that he was naked (although he was in fact only shirtless), that he did not know who the officers were, and that he would not come to the door.[4] While Officer Chavez continued to knock, Newton began hiding the plastic bags in different areas, such as cupboards. Newton threw a large black plastic bag through a door that Officer Garza presumed led to a kitchen pantry, and he entered through the doorway. Officer Garza assumed at this point that Newton had barricaded himself in the pantry, and he requested IPD backup at about 2:55 a.m.

Officer Garza then thought he heard a garage door open and a car start. He proceeded toward the sound, and, as he rounded the corner, he saw a black BMW exit a garage that was part of the same structure as unit 1032. Officer Garza saw that the driver (Newton) was the same person whom he had observed in the apartment. He instructed Newton to stop, and, when he did not, Officer Garza gave chase on foot. Officer Garza alerted Officer Chavez and called in a partially correct license plate number to IPD (although he

---

[4]Newton testified that he feared the person knocking on the door was only impersonating a police officer and was intent on robbing him. The court need not decide whether this was the reason he refused to respond to the officer's knock.

identified the vehicle as a Mercedes, not a BMW).  Newton reached the entrance of the large, gated apartment complex but turned back into the complex after observing that a police officer from the bordering city of Coppell had effected a traffic stop.[5]  Officer Garza lost sight of him.

Newton eventually abandoned the BMW within the complex and fled on foot.  He was arrested a short time later while walking behind a nearby Tom Thumb grocery store.  Officers searched Newton incident to his arrest and found a cellular telephone in his possession.  After Newton was arrested, officers brought him back to the complex, where Officer Garza identified him as the person who had been inside the apartment and who had driven the BMW.

Officer Garza contacted his supervisor to arrange for a search warrant and returned to unit 1032 to monitor the apartment and to secure the scene.  He also talked again to the complainant and contacted the Winsted Apartments manager to determine the identity of the lessee of unit 1032.  The manager provided this information but, per company policy, declined to provide the apartment keys (which IPD would have used instead of knocking down the door to execute a search warrant).  No one entered the unit until a warrant was obtained.

Officer Garza assisted IPD narcotics investigator Lamark

_____

[5]The traffic stop was unrelated to the events transpiring at the Winsted Apartments.

- 5 -

Carstarphen ("Officer Carstarphen") by providing information needed to obtain a warrant to search unit 1032. Officer Carstarphen had been awakened at about 3:45 a.m. and advised that he was needed at IPD to act as lead investigator and prepare a search warrant affidavit. He reported to the IPD narcotics office. Officer Carstarphen was experienced writing affidavits based on his personal knowledge. This was his first "call out" warrant, i.e., one that was written more quickly (and based on the personal knowledge of others) because officers were waiting to execute it. To prepare the affidavit, Officer Carstarphen used call notes and information that Officer Garza provided. The two spoke at least twice by telephone (the second time to answer questions Officer Carstarphen's supervisor had about the affidavit). Officer Carstarphen spoke to no other IPD officers who had been at the scene. Prior to executing the warrant on May 30, 2008, Officer Carstarphen never visited the Winsted Apartments.

After his initial conversation with Officer Garza, Officer Carstarphen drafted an affidavit for a search warrant. His affidavit stated, in part, that "Officer Garza while standing on the walkway directly outside of this apartment observed through an open window blind [Newton] concealing several clear distribution baggies which contained marijuana inside of a refrigerator located in the kitchen." G. Ex. 4 at 1. This statement was partially incorrect. Officer Garza did not tell Officer Carstarphen that he

had stood on the walkway or that he had observed Newton through an open window blind.

Before submitting the affidavit to the magistrate, Officer Carstarphen re-contacted Officer Garza to verify the information in it. After Officer Carstarphen's supervisor approved the affidavit, Officer Carstarphen signed it at 6:51 a.m. and presented it to a magistrate, who issued a warrant authorizing the police to search unit 1032 and the BMW.

Officers Carstarphen and Garza and other IPD officers executed the warrant. They encountered an overwhelming smell of fresh marihuana. The police found bags of hydroponic marihuana in the kitchen cabinets, oven, and master bedroom closet. Some of the bags were labeled as containing various strains of marihuana. The officers found loose marihuana lying on the floor of the garage. Altogether, they seized almost 80 pounds of marihuana. The police also found distribution bags, plastic bags designed for vacuum sealing food, and drug notes. Officer Carstarphen searched the BMW and found a cellular telephone, a drug note, and about $2,200 in cash.

Once Officer Carstarphen was present at the Winsted Apartments, and after entry had been made into unit 1032 and the scene was secured, he realized that there was no walkway and that this sentence in the search warrant was factually incorrect. He had assumed there was a walkway because other complexes in Irving

have them.  The error was based on a miscommunication with Officer Garza, who did not in fact tell him there was a walkway.  He also recognized that the reference to an open window blind was inaccurate because he could see that the blinds were not open. Officer Garza showed Officer Carstarphen that he had not been looking through an open window but had looked through the right-hand side of the window between the blind and window frame.  In two subsequent affidavits for warrants to search and seize the two cellular telephones, Officer Carstarphen provided a correct description of Officer Garza's conduct, *see* G. Exs. 65 and 66, although he did not correct the affidavit that resulted in the initial search warrant.  Officer Carstarphen's mistakes in the search warrant application (G. Ex. 4) were due to miscommunications with Officer Garza, not intentional or deliberate errors.  Officer Carstarphen believed, based on the statements of the complainant (e.g., traffic consistent with drug trafficking) and the odor of marihuana emanating from unit 1032, that he had probable cause to search the apartment even without the information that Officer Garza had obtained by peering through the opening between the blind and window frame.

                                    B

     IPD officers determined that the black BMW driven by Newton belonged to codefendant Kurt Vollers ("Vollers"), a resident of nearby Coppell.  The IPD contacted the Coppell Police Department

("CPD") to advise of Newton's arrest and of the search of unit 1032. An IPD detective contacted CPD Sergeant Samuel Lujan ("Sgt. Lujan") and requested that he establish surveillance on Vollers' residence in Coppell. Sgt. Lujan went to the residence for this purpose and remained outside.

Sgt. Lujan contacted CPD Sergeant William Knack ("Sgt. Knack"), a member of the CPD organized crime unit,[6] to request that he visit Vollers' residence for the purpose of conducting a knock and talk. Sgt. Lujan advised Sgt. Knack that the IPD had executed a search warrant, what they had seized, and that they had impounded Vollers' car. Before Sgt. Knack reached Vollers' house, however, Vollers departed with an unknown male (later identified as his brother) and used a pay telephone in the parking lot of a Tom Thumb grocery store (the one at which Newton had been arrested).[7] Vollers' brother had come to the residence earlier that morning to advise Vollers that the police had gone to their parents' home in Rockwall looking for Vollers. Vollers wanted to get his car back, so he and his brother drove to the Tom Thumb, where he telephoned the IPD. The person to whom he spoke advised Vollers that the police had arrested a person who had been staying with him.

Sgts. Lujan and Knack each drove to the Tom Thumb to speak

_____

[6]The CPD organized crime unit investigates narcotics offenses.

[7]The Winsted Apartments are located only about two miles from Vollers' house. The Tom Thumb grocery store is approximately midway between the two.

with Vollers.  Because they were in plain clothes, they arranged for a marked CPD unit to activate its lights before Sgt. Lujan approached Vollers' vehicle, which was located at a nearby gas station.  Vollers expressed a preference to speak with the officers away from his brother, so the three conferred in Sgt. Lujan's truck.

Sgt. Lujan informed Vollers that Newton had been arrested, that he had been driving Vollers' car, that marihuana had been found in an apartment that he had recently occupied, and that the police "knew what was up."  Vollers advised the officers that he had loaned his car to "J.P." (the name by which he calls Newton).  According to Vollers, "J.P." came to town frequently.  On May 28, 2008 Vollers picked him up at the airport, where he had flown in from Las Vegas.  Newton spent the night at Vollers' house, remained there the following day, and departed at about 9:00 p.m. on the evening of May 29, borrowing Vollers' car (the black BMW) and leaving his bags behind.  Newton planned to remain at Vollers' residence for an indefinite period.  Vollers expected him to return to the house that night, but he had not seen him since he departed with Vollers' car.

Sgts. Lujan and Knack asked Vollers if he had anything to hide at his house, indicating they were interested to know whether he had a dealer-size quantity of drugs.  Vollers responded that he had a small amount of marihuana for personal use.  They asked Vollers

for consent to search his house, which he gave (Vollers owns the home in his name).   Vollers did not feel threatened, and his consent was voluntary.   Vollers and his brother drove to the house in one vehicle, followed by Sgt. Knack and Sgt. Lujan in their respective vehicles.   Once at the house, Vollers was allowed to enter first to inform his wife of the search so that she could leave with the couple's one-year old child.   Vollers then directed the officers to the garage, where a small amount of marihuana was stored.

At the officers' request, Vollers next directed them to the room where Newton stayed: an upstairs guest bedroom that also functioned as Vollers' office.   The door to the room was unlocked (the evidence is unclear regarding whether the door was open, partially open, or closed when the officers arrived at the room). The room was used by guests of the Vollers family when staying overnight, and Newton never excluded Vollers from the room. Vollers would not have allowed Newton or anyone else to exclude him from this part of the house, although he felt that Newton could have privacy there.   Vollers owned the furniture in the room, and it contained Vollers' computer as well as memorabilia and football trophies that he had on display.   Newton did store basketball equipment in the closet.   Vollers commonly entered the room to use the computer when Newton was staying there.

Newton did not own or rent the residence or room; his name was

not on the door to the room; he did not receive mail at that address; and he did not contribute to the upkeep of the dwelling. Occasionally, he bought groceries or compensated Vollers by providing marihuana or "tipping" relatively small amounts of money ($100 bills) when he felt like helping out.   When Newton stayed with Vollers, he was usually waiting on a marihuana delivery. Newton never took precautions at the home, such as using locks, for his own privacy.   Vollers informed the officers that Newton had placed his belongings in the room.   At the time this occurred, Newton was being held in the IPD jail.   When Sgt. Knack entered the room, he observed keys, an airline boarding pass, and a drug note lying on top of the covers on the bed.   Three duffel bags were situated on the floor close to the bed.   One was closed, the second was partially unzipped, and the third was fully unzipped and open. The contents of the partially and fully opened bags could be seen without disturbing them.   The partially unzipped bag contained an electronic money counter, and the fully open bag contained large amounts of U.S. currency ($100 bills in bundles).   The boarding pass had the name "John Newton" on it.   Vollers said that this was the same person as "J.P."   Newton had not given Vollers consent to open or go into the bags, and Vollers would not have done so.

The officers returned downstairs about five to seven minutes after they went upstairs to the room.   Officers took all three bags as well as the boarding pass, keys, and drug note to the CPD.   They

arranged for a canine to sniff the bags, and the dog alerted on them.  Sgt. Knack then obtained a search warrant for the bags.  No bag was opened or searched until a warrant was obtained.

When officers executed the warrant, they found $305,560 in cash, a money counter, drug notes, and pill bottles with Newton's name on them.  They also found a note indicating that a large amount of cash was stored in a shoe box.  Sgt. Knack recalled seeing a shoe box under the bed in the room to which Vollers had taken them.  Sgt. Lujan contacted Vollers, who again consented to the officers' entering his house.  CPD retrieved the shoe box and returned it unopened to police station.  Sgt. Knack then obtained a warrant to search the shoe box.  Police found $75,250 in cash.  Altogether, the detectives seized $380,810 in U.S. currency from Vollers' house.

C

Based on information obtained on May 30, IPD officers came to believe that Newton lived in Los Angeles.  At the request of a Drug Enforcement Administration agent, a member of the Los Angeles Police Department ("LAPD") narcotics enforcement detail, Detective J.D. Garcia ("Detective Garcia"), contacted the IPD.

Detective Garcia eventually determined that Newton was on probation in California for prior drug felony convictions and that he lived in an apartment in Tarzana, California.  Based on the evidence developed in Texas, Detective Garcia obtained a search

warrant that LAPD officers executed at the apartment. Inside, officers found, among other things, a notebook that was determined to be a drug ledger detailing Newton's drug trafficking activities in Dallas, the names of buyers and sellers, and the prices per pound.

D

Newton moves to exclude all evidence against him.[8] Newton contends that the warrant to search the Irving apartment was based on an intentionally false statement and on Officer Garza's illegal observation of the apartment interior. He reasons that the remaining searches of the Irving apartment, his person, and the BMW should be excluded as fruit of the poisonous tree. He also reasons that the search and seizure of the bags in the Coppell home were illegal because Vollers could not give consent to search his room or his bags and because officers searched his bags prior to seizing them. The government opposes the motion on several grounds.[9]

--------

[8]Newton filed his initial motion to suppress evidence on February 16, 2010. With regard to the search of the Irving apartment, Newton only contended that the warrant was lacking in probable cause, and he did not address the good-faith exception to the warrant requirement. After the government filed its response, Newton obtained leave to file an amended motion to suppress. In it, he contends that officers intentionally included a false statement in the affidavit for the search warrant of unit 1032. The court construes the amended motion to modify, not entirely supersede, the initial motion. The court therefore addresses together the arguments raised in both motions.

[9]A primary basis on which the government opposes the motion is that Newton was on probation on May 30, 2008, and his conditions of probation included the provision that he was subject to search.

II

Newton contends that Officer Garza's observation of the interior of unit 1032 at the Winsted Apartments is an illegal search, and that the evidence seized from him incident to his arrest and from the BMW should be excluded as fruit of this illegal search.[10]

A

"A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Guerrero-Barajas*, 240 F.3d

---

*See* G. Ex. 67.   In *United States v. Knights*, 534 U.S. 112, 119-21 (2001), the Court held that a probationer subject to a search condition has a lower expectation of privacy in his belongings and home, that the government has a heightened interest in the search of a probationer, and that officers therefore need only have a reasonable suspicion of wrongdoing to search a probationer.

To the extent that Newton seeks to suppress evidence that is admissible under the good-faith exception, plain view exception, or independent source doctrine, the court need not address the merits of the government's argument.

To the extent the government relies on this argument concerning the airline boarding pass and keys, the court rejects it.   In *Knights*, unlike in this case, the defendant was known to the investigating officer as a probationer subject to a search condition.   *See id.* at 115 n.1.   Apart from the California apartment search, there is no evidence that law enforcement officers knew at the time of the search that Newton was on probation or that they purported to exercise search powers under the conditions of his probation.   The government's interest in the warrantless search was not, as in *Knights*, heightened above what it would be for other citizens.

[10]Newton does not contend that the search incident to his arrest or the search of the BMW are otherwise illegal.

428, 432 (5th Cir. 2001)).   "However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid."   *Id.* (citing *United States v. Castro*, 166 F.3d 728, 733 n. 7 (5th Cir. 1999) (en banc)).   "The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure."   *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001).   The exclusionary rule also "encompass[es] evidence that is the indirect product or 'fruit' of unlawful police conduct."   *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

B

The court holds that Newton is not entitled to suppress the evidence seized from his person and the BMW.   "[I]f not even the 'but for' test can be met so that the evidence would not have been found but for police illegality, then clearly the evidence is not a fruit of the prior Fourth Amendment violation."   *United States v. Moore*, 329 F.3d 399, 404 (5th Cir. 2003) (brackets added and omitted) (quoting 5 Wayne LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(a), at 236 (3d ed. 1996)).[11]   In the present case, even without knowledge of Officer Garza's observation

---

[11]In *Moore* the defendant argued that he had been illegally handcuffed during a traffic stop and that this violation required the exclusion of drugs subsequently found in a search of his car. *Moore*, 329 F.3d at 404.   The court determined that the search of the car was proper because it would have occurred even absent the illegal detention and no other circumstances surrounding the search were impermissible.   *Id.*

- 16 -

through the window of unit 1032, IPD officers would have had probable cause to arrest and search Newton and search the BMW, and would in fact have done each.   The searches of Newton and the BMW would have occurred even without the observation.

IPD police received a report of drug activity involving unit 1032 of the Winsted Apartments.  After arriving at the scene during the early morning hours of May 30, Officer Garza obtained a more detailed explanation of the drug activity from the complainant (an upstairs neighbor), including that there was a great deal of vehicular traffic connected with unit 1032, that the complainant had been able to smell burnt marihuana in his unit (the unit immediately above unit 1032) for about one or two days, and that, as he was standing on his balcony a few nights earlier, he had overheard someone in the vicinity refer to being "coked up."  On his arrival to speak to the complainant, Officer Garza smelled a strong odor of green marihuana emanating from unit 1032.   Soon afterward, Officer Chavez knocked on the door of the unit and announced that he was a police officer.   Shortly after that, a black BMW exited the adjacent garage and sped away.  Officer Garza was able to see the driver (Newton), and officers arrested a man who matched the driver's description as he was walking behind a nearby grocery store.   Officer Garza identified him as the man driving the BMW.  Officers therefore had probable cause to arrest and search Newton, and to search the BMW, even without Officer

Garza's observation through the window of unit 1032.  They would have done each even without his observation.

### III

Unit 1032 was searched pursuant to a search warrant.  Newton contends that the good-faith exception to the exclusionary rule does not apply to this search because the affidavit supporting the warrant misstated several facts and those misstatements were made either intentionally or recklessly.  Newton also contends that the evidence seized from the apartment must be excluded as fruit of Officer Garza's initial observation through the unit window, which he contends was illegal.

### A

### 1

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The exclusionary rule precludes the government from relying on illegally-seized evidence. *United States v. Houltin*, 566 F.2d 1027, 1030 (5th Cir. 1978).  The purpose of the exclusionary rule is to "deter unlawful police conduct."  *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006).  This purpose will not be served, and thus the rule is inapplicable, where evidence is obtained in "objectively reasonable good-faith reliance upon a search warrant."  *Id.* (internal

quotation marks omitted).

In reviewing a search pursuant to a warrant, the court engages in a two-step inquiry. *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003). First, the court determines whether the good-faith exception to the exclusionary rule applies. *Id.* (citing *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129-30 (5th Cir. 1997)). If it does, the court "need not reach the question of probable cause for the warrant unless it presents a 'novel question of law,' resolution of which is 'necessary to guide future action by law enforcement officers and magistrates.'" *Id.* (citing *Pena-Rodriguez*, 110 F.3d at 1129-30). Second, if the good-faith exception does not apply, the court proceeds to a determination of whether "'the magistrate had a substantial basis for . . . concluding that probable cause existed.'" *United States v. Lampton*, 158 F.3d 251, 258 (5th Cir. 1998) (ellipsis in original) (quoting *Pena-Rodriguez*, 110 F.3d at 1129-30).

"Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *Payne*, 341 F.3d at 399 (citing *United States v. Leon*, 468 U.S. 897, 921-25 (1984)). "The 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal

despite the magistrate's authorization.'" *United States v. Pope*, 467 F.3d 912, 917 (5th Cir. 2006) (citing *Leon*, 468 U.S. at 922 n. 23).  Normally, the issuance of a warrant by a magistrate suffices to establish officers' good faith.  *Pena-Rodriquez*, 110 F.3d at 1130.  But good faith cannot be established where the affidavit on which the warrant is based is so lacking in indicia of probable cause that belief in the existence of probable cause is unreasonable.  *Id.*

The good-faith exception cannot apply if one of four circumstances is present:

> (1) [i]f the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

*Payne*, 341 F.3d at 399-400 (quoting *United States v. Webster*, 960 F.2d 1301, 1307 n. 4 (5th Cir. 1992) (per curiam)).  To bar the application of the good-faith exception based on an affiant's intentional falsity or reckless disregard for the truth, a defendant must establish the falsity or reckless disregard by a

preponderance of the evidence.[12] *United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002) (citing *Franks v. Delaware*, 438 U.S. 154, 156-57 (1978)). If he does so, the court must, under *Franks*, look to the remaining portions of the search warrant affidavit. "[I]f the affidavit would have sufficiently provided probable cause without the false information, the warrant did not violate the Fourth Amendment and the evidence should not [be] excluded." *Cavazos*, 288 F.3d at 710.[13]

---

[12]In considering whether an officer acted intentionally or with reckless disregard for the truth, "a court considers the materiality of the misrepresentation, whether exigency or haste preceded the affidavit, the officer's level of training and experience, whether the officer consulted with an attorney, and whether the officer disclosed the fact underlying any conclusory statements in the affidavit." *United States v. Abdullah*, 2007 WL 4334106, at *2 (S.D. Tex. Dec. 7, 2007) (citing *United States v. Gallegos*, 239 Fed. Appx. 890, at 895 (5th Cir. 2007); *United States v. Alvarez*, 127 F.3d 372, 375 (5th Cir. 1997); *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982)).

[13]*Leon* incorporates the line of cases arising under *Franks*. The *Leon* Court cited *Franks* in holding that the good-faith exception does not apply if the warrant was based on an affidavit containing a knowing or reckless falsity. *Leon*, 468 U.S. at 914. Consistent with the Fifth Circuit's holdings in cases like *Cavazos*, the court will address *Franks* when deciding whether the *Leon* good-faith exception applies. If no knowing or reckless falsity was contained in the warrant affidavit, *Franks* does not invalidate the warrant, the good-faith exception applies (assuming no other *Leon* exception applies), and the search was valid if the officers' reliance on the warrant was objectively reasonable. If the affidavit contains a knowing or reckless falsity, the good-faith exception does not apply, and the court must consider, under *Franks*, whether the affidavit establishes probable cause without the false information. This approach is consistent with that of the Fifth Circuit. In *Cavazos* the court held that, if the warrant affidavit contains a false statement made illegal by *Franks*, the good-faith exception does not apply, and the court must determine whether the affidavit established probable cause without the

2

At the suppression hearing, Newton established that two facts contained in IPD's search warrant affidavit were incorrect.[14] Officer Carstarphen averred in the warrant affidavit:

> On May 30, 2008 Officer[s] Garza and Chavez responded to a report of possible drug sales from [unit 1032]. Officer[s] Chavez and Garza arrived at [unit 1032] and Officer Chavez knocked on the front door of the apartment in an attempt to contact the resident(s). Officer[s] Garza and Chavez could smell a strong odor of fresh green marijuana emitting from the [unit 1032]. Officer Garza *while standing on the walkway* directly outside of this apartment observed *through an open window blind* [Newton] concealing several clear distribution baggies which contained marijuana inside of a refrigerator located in the kitchen.
>
> Officer Garza also observed [Newton] carry a cardboard box and bundle of plastic wrapping to the attached garage. Officer Garza then observed [Newton] exit the garage driving [a] 2003 BMW four door . . . . [Newton] was taken

---

offending statement. *See Cavazos*, 288 F.3d at 709-710.

[14]In his amended motion to suppress, Newton argues that the affidavit contained a misstatement about Newton's behavior in the kitchen. In the affidavit for the May 30, 2008 search of unit 1032, Officer Carstarphen stated that Officer Garza observed Newton place clear baggies containing marihuana in the apartment's refrigerator. In a June 4 search warrant affidavit, Officer Carstarphen averred that Officer Garza saw Newton take a cardboard box containing plastic wrappings to the apartment's attached garage. And in his police report, Officer Garza stated that he saw Newton run around into the kitchen area. These three statements are not mutually exclusive or contradictory, nor are they called into question by evidence adduced at the suppression hearing. Indeed, Newton failed to advance this theory at the hearing. The court need not therefore consider this argument as part of its *Franks* analysis or otherwise.

into custody . . . while running on foot.  The
2003 BMW four door . . . was located in the
apartment complex parking lot[.]

G. Ex. 4 at 1-2, ¶ 5 (emphasis added).  Newton demonstrated that
the italicized portions of the affidavit were incorrect.  Officer
Garza was standing on ground cover directly in front of the
apartment window, not on a walkway.  And he peered through a gap
between the wall and the blinds, not through an open window blind.

But Newton has not proved, as he must, that Officer
Carstarphen knew these statements were false or acted recklessly.
Officer Carstarphen was not present at the Winsted Apartments that
morning; he relied instead on a description of events relayed to
him by Officer Garza.  That description necessarily focused on the
key aspects of the morning's events.  Officer Carstarphen, who had
been to other apartments in the area but never to the Winsted
Apartments, testified that he stated that Officer Garza was on a
walkway because he assumed, based on his prior experience with
Irving apartment complexes, that the Winsted Apartments must have
been laid out in that manner.  He also testified that he
misunderstood Officer Garza's description of the aperture through
which the officer had viewed the apartment's interior.  The court
finds that Officer Carstarphen's explanation is credible.
Moreover, this was Officer Carstarphen's first "call out" warrant.
He composed the affidavit rather quickly, in the early morning,
after being called at home to assist in the investigation.  He

drafted the affidavit without visiting the apartment complex because the officers at the scene were coming to the conclusions of their shifts. Nevertheless, a supervisor reviewed the affidavit and posed questions about it, and Officer Carstarphen re-contacted Officer Garza to clarify details. Although Newton suggested at the suppression hearing that Officer Carstarphen included the misstatements because he was concerned that the magistrate would not issue a warrant without them, the warrant contains sufficient other indicia of probable cause that the court considers it unlikely that Officer Carstarphen would have thought it necessary to lie. Moreover, he revised his affidavit to correct these errors when seeking two cellular telephone search warrants just a few days after this warrant was requested. Had he intended to lie, he probably would have persisted in doing so in affidavits submitted just days later. Newton did not adduce evidence that supports the finding that Officer Carstarphen knew these statements were mistaken, and, even assuming the government has the burden of proof, it proved that Officer Carstarphen did not act knowingly or recklessly.

At most, the misstatements were made negligently, and negligent statements do not vitiate the good-faith exception. *See United States v. King*, 162 F.3d 93, 1998 WL 770653, at *1 (5th Cir. 1998) (per curiam) (unpublished) ("[B]ecause the district court found that misstatements made in this affidavit were merely

negligent and not intentional, . . . the good-faith exception to the exclusionary rule applies to the evidence seized from [defendant's] home pursuant to the search warrant.").

3

Even if Officer Carstarphen's false statements were made intentionally or recklessly, the evidence obtained at unit 1032 should not be excluded because the remaining facts set out in the affidavit still establish probable cause authorizing issuance of a warrant.  Officer Castarphen provided the magistrate three unquestionably true facts: IPD officers received a report of possible drug sales at unit 1032; officers smelled a strong odor of green (not burning) marihuana emanating from that apartment, indicating that marihuana was being stored, not merely consumed, inside; and a man exited an adjacent garage in a black BMW and fled the complex.

"A probable cause determination is a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Cavazos*, 288 F.3d at 710 (internal quotation marks omitted).[15]  The court

_____

[15]At the suppression hearing, Newton argued that the magistrate would not have issued the warrant but for Officer Carstarphen's misstatements (and Officer Garza's observation).  This applies a subjective standard to the probable cause inquiry, but the probable cause inquiry is objective: the court must determine whether the affiant provided enough evidence to show there was probable cause. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 210 (5th Cir. 2009)

holds that these three facts alone, without Officer Garza's observation of Newton's conduct in the apartment, established probable cause to search unit 1032.[16]

4

For the reasons described above, the court holds that Officer Carstarphen's misstatements neither vitiate the application of the good-faith exception nor invalidate the warrant.

B

Newton also contends that the good-faith exception is inapplicable to the search of unit 1032 because the warrant was based, in part, on Officer Garza's pre-warrant observation. The court assumes *arguendo* that Officer Garza's observation was made in violation of Newton's Fourth Amendment rights.

If a search is unconstitutional, the court must exclude both the evidence found during that search and evidence later discovered

_____

("[The court should] find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense [had been] committed[.]").

[16]The only potentially misstated facts are that Officer Garza was standing on a walkway and that he was looking through an open window blind; this does not preclude consideration of Officer Garza's observation of Newton in unit 1032. But Newton also challenges the observation as an illegal search. As explained below, the court must consider the propriety of the warrant without the illegally gained information. *See United States v. Davis*, 430 F.3d 345, 357-58 (6th Cir. 2005) ("[W]e must remove [the illegally obtained] fact from the affidavit when considering whether there is still sufficient information to establish probable cause to search the vehicle."). The court therefore does not consider Officer Garza's observation of the inside of the apartment in deciding whether the misstatements invalidate the warrant.

as a result of information obtained during the initial illegal search. *See United States v. Scroggins*, ___ F.3d ___, 2010 WL 724688, at *9 (5th Cir. Mar. 4, 2010) (citing *Segura v. United States*, 468 U.S. 796, 804 (1984)).[17] Evidence obtained pursuant to a warrant that is based on evidence obtained illegally must also be excluded as fruit of the poisonous tree. *See United States v. Dortch*, 199 F.3d 193, 202-03 (5th Cir. 1999) (holding that evidence obtained pursuant to search warrant must be excluded because search resulted from prior illegal search). Newton contends that the search of unit 1032 resulted from Officer Garza's observation of Newton's conduct within the apartment, that this observation was an illegal search, and that the subsequent search of the apartment must therefore be excluded.

Even if Officer Garza's observation of Newton's conduct constituted an illegal search, the evidence seized from unit 1032 is still admissible because the warrant to search that unit resulted from a source genuinely independent of Officer Garza's observation. For the independent source doctrine to validate a warrant, the government must show

> (1) that the police would still have sought a warrant in the absence of the illegal search;

---

[17]The good-faith exception is inapplicable where a warrant is based on unlawful police activity. *See United States v. Grazioso*, 2006 WL 1767677, at *10 (N.D. Tex. June 28), *recon. granted on other grounds*, 2006 WL 2285585 (N.D. Tex. Aug. 9, 2006) (Fitzwater, J.), *aff'd*, 2008 U.S. App. LEXIS 6813 (5th Cir. Mar. 31, 2008) (per curiam).

> and (2) that the warrant would still have been
> issued (i.e., that there would still have been
> probable cause to support the warrant) if the
> supporting affidavit had not contained
> information stemming from the illegal search.

*United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002). To establish the second requirement, the government need not offer subjective proof that the magistrate would have issued the warrant. Instead, it must show that, purged of taints, the warrant contains sufficient evidence to constitute probable cause for its issuance. *See United States v. Restrepo*, 966 F.2d 964, 970 (5th Cir. 1992). If the government meets its burden, the taint is removed from the warrant, and the evidence seized pursuant to the warrant is not subject to being suppressed. *See Runyan*, 290 F.3d at 237 ("[B]ased on our determination that the warrants were issued independently of the prior illegal search, we find that any additional evidence obtained pursuant to these warrants is not the 'fruit of the poisonous tree' and is therefore admissible.").

As explained above, the combination of the neighbor's report of drug activity at unit 1032, the officers' detection of a strong odor of green marihuana emanating from that unit, and Newton's flight from a garage near that unit provide probable cause to search it. And Officer Carstarphen's supervisor testified that IPD would have sought a search warrant even without Officer Garza's observation. The government has established that the independent source doctrine purges any taint from the warrant. Newton's motion

as to suppress the evidence seized from unit 1032 is therefore denied.

                                    IV

Newton also moves to suppress the evidence seized from Vollers' house.  He contends that the search and seizure were the fruit of prior illegal searches, that the search of the room in which he was staying was illegal because Vollers could not consent to the search, and that the search and seizure of his belongings were illegal.

                                    A

Newton contends that the evidence obtained through the search and seizure of his bags and the shoe box found at Vollers' residence must be suppressed as fruit of Officer Garza's initial illegal search of unit 1032.  Even assuming *arguendo* that Officer Garza's observation was obtained illegally, the subsequent searches and seizures of the bags and shoe box are not subject to suppression.  The same evidence that justified issuance of the search warrant for unit 1032——combined with the evidence found in the apartment——attenuate any link between Officer Garza's observation and CPD's decision to search and seize Newton's belongings.  Therefore, the searches and seizures are not the fruit of Officer Garza's observation.

                                    B

Newton also challenges the search of the room in which he was

                                  - 29 -

staying at Vollers' residence.    Newton occupied the room as
Vollers' guest and intended to remain there indefinitely.    As the
government concedes, he had a reasonable expectation of privacy in
the room. [Br. 6]  *See United States v. Taylor*, 482 F.3d 315, 318
(5th Cir. 2007) (citing *Minnesota v. Olson*, 495 U.S. 91 (1990)).
The government also concedes that officers entered the room without
a warrant.

     The Fourth Amendment protects individuals from unreasonable
searches and seizures that intrude on reasonable expectations of
privacy.    "Warrantless searches are presumptively unreasonable."
*United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992)
(citing *Horton v. California*, 496 U.S. 128 (1990)).    "Valid consent
to a search is a well-established exception to the normal
requirement that law enforcement officers must have a warrant
grounded in probable cause before conducting a search."   *United
States v. Shelton*, 337 F.3d 529, 532 (5th Cir. 2003) (citing
*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).   "In *United
States v. Matlock,* the Supreme Court extended to third parties the
ability to grant this consent when those third parties 'possess[]
*common authority* over or other sufficient relationship to the
premises or effects sought to be inspected.'"   *Id.* (quoting *United
States v. Matlock*, 415 U.S. 164, 171 (1974)).   To satisfy the
consent exception, the government must establish by a preponderance
of the evidence that the consent was freely and voluntarily given

and that the party giving consent had authority to do so.  *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (quoting *United States v. Gonzales,* 121 F.3d 928, 938 (5th Cir. 1997)).  To establish that the third party had authority to consent to the search, the government must show either that he had, or officers reasonably believed he had, joint access or control for most purposes.  *Gonzales*, 121 F.3d at 938.

At the suppression hearing, Newton challenged the voluntariness of Vollers' consent.  Vollers testified credibly, however, that he voluntarily consented to the search of the room in which Newton's belongings were located.  And other evidence corroborates this testimony.  Among other things, Vollers and his brother drove to his residence in a separate vehicle from the CPD officers, he was permitted to enter his home before they entered, and he voluntarily took them to the garage (where he disclosed incriminating evidence about his own marihuana use) before directing them upstairs to the room where Newton was staying.

Newton also argues that Vollers lacked the authority to consent to the search of the room.  The court disagrees.  Vollers owned the residence, he owned the furniture in the room, and the room contained his computer as well as memorabilia and football trophies that he had on display.  Vollers commonly entered the room to use the computer when Newton was staying there.  Further, Newton stayed at the residence as Vollers' guest when visiting town, not

as a roommate or tenant.  Newton did not pay rent, his name was not on the door to the room, he did not receive mail at that address, and he did not contribute to the upkeep of the dwelling.  Nothing about Newton's rooming arrangement suggests that Vollers relinquished his right to enter this room, even if he felt that Newton could have privacy there.  This indicates that he had actual authority to consent to the officers' entry.  Additionally, the officers reasonably believed he had such authority; they knew he was the owner of the residence, and they neither heard nor saw anything that indicated that he lacked the authority to consent.  The officers gained valid consent from Vollers to enter Newton's room and were therefore in the room legally.

C

Newton also contends that Vollers lacked the authority to consent to the searches of his bags and shoe box.  The government responds that the seizures of the bags and shoe box were allowed by the plain view doctrine, and that the subsequent searches were conducted pursuant to warrants.

A warrantless seizure of items is permissible if "(1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was immediately apparent; and (4) the police had a lawful right of access to the item." *United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) (internal quotation marks omitted) (citing

*United States v. Buchanan*, 70 F.3d 818, 825-26 (5th Cir. 1995)).

Here, the bags were beside the bed in plain view of the officers. The officers were in the room legally, pursuant to Vollers' consent. One bag was partially open and one was completely unzipped and open. Without disturbing the bags, officers could observe that one contained a large amount of U.S. currency and the other contained an electronic money counter. Given that IPD detectives had found a large amount of marihuana and drug notes in unit 1032 and in the black BMW, the incriminating nature of the currency and money counter——evidence or fruits of crimes——would have been apparent to the officers. Their seizure of these two bags was therefore proper.

Their subsequent search of the two bags was pursuant to a warrant that was based on probable cause, including the canine sniff. Newton has presented no valid reason to conclude that the government cannot rely on the good-faith exception for that search. *See Payne*, 341 F.3d at 399. Newton's motion is therefore denied as to the U.S. currency and the electronic money counter found in the two bags.

The court also denies Newton's motion as to the note containing descriptions of his drug activities. From their training and experience, detectives could have determined that it described drug transactions. The plain view doctrine therefore also allows the seizure of this evidence.

- 33 -

D

The plain view exception cannot apply, however, to the unopened bag, the shoe box, the airline boarding pass, and the keys, because the incriminating nature of these articles was not immediately apparent.  Regarding the bag, the detectives testified it was unopened when they arrived in the room.  They could not have known it contained contraband or evidence or fruits of crimes. With respect to the shoe box, nothing suggested that it contained evidence of criminal conduct.  Sgt. Knack testified that he saw the shoe box during the initial search of the room, but he left it in the room, apparently on the belief that it did not contain evidence that was subject to seizure.  Although a note found in Newton's bag mentioned the existence of the shoe box, nothing on the note suggested that this particular shoe box was the one described by the note.  The government argues that the shoe box was torn and that officers could see the cash inside, but it elicited no such testimony during the suppression hearing, and the photograph of the shoe box indicates that such a view would not have been possible. It was not until officers executed the warrant that they found a note indicating that a large amount of cash was stored in a shoe box.

Similarly, nothing about the keys or the airline boarding pass suggested that they were incriminating.  The plain view doctrine therefore does not justify the seizure of these pieces of evidence.

E

The evidence found in the closed bag and the shoe box are not subject to suppression, however, due to the operation of the independent source doctrine.

"[W]hen evidence initially unlawfully seized is subsequently obtained via a search warrant based on independent information, the independent source rule applies to both evidence seen for the first time during the lawful search and evidence seen in plain view at the time of the warrantless search." *United States v. Hearn*, 563 F.3d 95, 102 (5th Cir. 2009) (citing *Murray v. United States*, 487 U.S. 533, 541-42 (1988)). CPD eventually obtained a warrant for the bag and the shoe box and then searched both items. For this warrant to be an independent source of the evidence, the government must show (1) that the affidavit, absent any illegally gotten information, contained sufficient facts to constitute probable cause and (2) officers would have pursued the search warrant without the illegality. *See id.*

Here, the only information that would have to be stricken from the affidavit for the zipped bag is that a drug dog alerted on the bag,[18] because that information would not have been obtained but for the illegal seizure. The magistrate was still presented with information that the apartment that Newton had recently exited

---

[18]Newton does not challenge this search as fruit of Officer Garza's observation. But even without this information, probable cause was established by the remaining facts.

- 35 -

contained 80 pounds of hydroponic marihuana, that Newton had fled the apartment in a BMW registered to Vollers, that Newton had stayed at Vollers' residence, that the bags belonged to Newton, that one of three bags found in Newton's room contained a large amount of currency, and that a second bag contained an electronic money counter. This evidence constituted probable cause to support the search of the remaining, unopened bag. It also presented a compelling indication that CPD detectives would have obtained the search warrant for the bag even without the initial seizure.

The warrant for the shoe box also presents an independent source of the evidence found in the box. The warrant contained the same information as the warrant for the bags, as well as evidence about the contents of two of the bags. The information linking Newton to the shoe box was legally obtained through a search conducted pursuant to a warrant. Officers could and would have obtained this warrant without the illegal seizure or Officer Garza's observation.

The keys and the boarding pass are not admissible under the independent source doctrine, however, because they were never the subject of a subsequent warrant.

F

Newton's motion to suppress is granted as to the keys and the airline boarding pass found on his bed. These two items were not seizable under the plain view doctrine, and the independent source

doctrine does not attenuate their seizure. The items were therefore improperly seized.[19]

Newton's motion is denied as to all three bags, the shoe box, and their contents.

V

Newton also moves to exclude evidence seized from his California apartment. The apartment was searched pursuant to a warrant on May 30, 2008. Newton contends the good-faith exception does not apply because the magistrate wholly abandoned his judicial role.[20]

The *Leon* exception for a magistrate's abandoning his judicial role is applied infrequently and only in extreme cases. The example cited by the Supreme Court in *Leon* involved a magistrate who abandoned his neutral and detached role by becoming the leader of a police search and assisting in personally executing the warrant he had issued. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979). There is no hint of such extreme action in this case. Moreover, the magistrate did not merely rubber stamp

---

[19]As stated above, the court rejects the government's contention that Newton's probation status justified all searches and seizures, including the seizure of the keys and airline boarding pass.

[20]Newton also contends that the warrant affidavit was so lacking in probable cause that belief in its existence was unreasonable, and that the warrant was fatally deficient in describing the place to be searched. But Newton presented no evidence of these deficiencies nor advanced them at the suppression hearing. The court therefore rejects them.

the police's efforts; there was sufficient evidence for the magistrate to reasonably find probable cause.

Newton also appeared to argue that the magistrate was extremely unreasonable in believing that Newton's apartment might contain evidence of a crime or contraband. But the warrant affidavit described the evidence collected in Texas and stated that Newton's address had been provided by his probation officer. The good-faith exception therefore applies, and officers acted reasonably in relying on the warrant in executing the search.[21]

Newton's motion to suppress the evidence seized from his California apartment is therefore denied.

*     *     *

Newton's February 16, 2010 motion to suppress evidence, as amended on March 17, 2010, is granted to the limited extent of suppressing evidence of the keys and airline boarding pass found on his bed at Vollers' residence and is denied in all other respects.

**SO ORDERED.**

April 13, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[21]Although Newton does not raise this argument, the court holds that the search of the California apartment is not invalid as fruit of the poisonous tree. The warrant was supported by sufficient other legally obtained evidence, and officers would have searched Newton's California apartment without Officer Garza's observation.