IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Criminal No. 3:09-CR-103-D(01) |
| VS. | § | |
| | § | |
| JOHN PATRICK NEWTON, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant John Patrick Newton ("Newton") moved to suppress evidence of his drug trafficking activities. Following a hearing, the court largely denied the motion. *See United States v. Newton*, 2010 WL 1460052, at *15 (N.D. Tex. Apr. 13, 2010) ("*Newton I*"). Newton moves for reconsideration of that decision based on the government's subsequent disclosure of evidence that codefendant Kurt Vollers ("Vollers"), a government witness at the suppression hearing, had been involved in previously-undisclosed marihuana trafficking with Brian Deloney ("Deloney"), a friend of Vollers who has now been indicted on drug charges. Newton asks the court to reconsider the suppression ruling as it relates to the search of Vollers' home and any collateral matters to which Vollers' testimony related and that the court did not suppress. For the reasons that follow, the court denies the motion.

I

A

The findings and rationale on which the court denied Newton's motion to suppress are set out extensively in *Newton I* and need not be repeated. The court will instead recount some of the facts summarily and focus on the facts and procedural history that are pertinent to Newton's motion for reconsideration.

In May 2008 officers of the Irving Police Department ("IPD") were dispatched to an apartment complex after a resident complained of the strong smell of marihuana emanating from one of the units. Newton was present in the unit. After an IPD officer attempted to make contact with Newton, Newton fled driving a black BMW. *Id.* at *2.

Following Newton's apprehension and arrest, the police determined that the black BMW belonged to Vollers ("Vollers"), a resident of nearby Coppell. *Id.* at *4. An IPD detective contacted Sergeant Samuel Lujan ("Sgt. Lujan") of the Coppell Police Department ("CPD") to request that he establish surveillance on Vollers' residence. Sgt. Lujan sought the assistance of CPD Sergeant William Knack ("Sgt. Knack") to conduct a knock and talk at Vollers' residence. Before Sgt. Knack reached Vollers' house, however, Vollers departed. *Id.*

Eventually, Sgts. Lujan and Knack initiated contact with Vollers at a parking lot, where the three met in Sgt. Lujan's

truck.  During the conversation the officers asked for and received Vollers' consent to search his residence.  Vollers and his brother drove to his house in one vehicle, followed by Sgt. Knack and Sgt. Lujan in their respective vehicles.  Once they arrived at the house, Vollers was allowed to enter first to inform his wife of the search so that she could leave with the couple's child.  Vollers then directed the officers to the garage, where a small amount of marihuana was stored.  *Id.*

At the officers' request, Vollers next directed them to the room where Newton stayed: an upstairs guest bedroom that also functioned as Vollers' office ("guest room").  When Sgt. Knack entered the room, he observed keys, an airline boarding pass, and a drug note lying on top of the covers on the bed.  Three duffel bags were situated on the floor close to the bed.  One was closed, the second was partially unzipped, and the third was fully unzipped and open.  The contents of the partially and fully opened bags could be seen without disturbing them.  The partially unzipped bag contained an electronic money counter, and the fully open bag contained large amounts of U.S. currency ($100 bills in bundles).  The boarding pass had the name "John Newton" on it.  Vollers said that this was the same person as "J.P."  Newton had not given Vollers consent to open or go into the bags, and Vollers would not have done so.  *Id.* at *5.

The officers took all three bags as well as the boarding pass,

keys, and drug note to the CPD.  They arranged for a canine to sniff the bags, and the dog alerted on them.  Sgt. Knack then obtained a search warrant for the bags.  No bag was opened or searched until a warrant was obtained.  *Id.*

When officers executed the warrant, they found $305,560 in cash, a money counter, drug notes, and pill bottles with Newton's name on them.  They also found a note indicating that a large amount of cash was stored in a shoebox.  Sgt. Knack recalled seeing a shoebox under the bed in the room to which Vollers had taken them.  Sgt. Lujan contacted Vollers, who again consented to the officers' entering his house.  CPD retrieved the shoebox and returned it unopened to the police station.  Sgt. Knack then obtained a warrant to search the shoebox.  Police found $75,250 in cash.  *Id.*

B

The court denied Newton's motion to suppress with respect to the partially unzipped and the fully unzipped and open duffel bags based on Vollers' consent to search the guest room.[1]  *Id.* at *15. In response to Newton's challenge to the voluntariness of Vollers' consent, the court found that Vollers had testified credibly that he voluntarily consented to the search of the guest room.  The

---

[1] The court first determined that these items were not fruit of the poisonous tree of observations of Newton made by police at an Irving apartment where the police first encountered him.  *Newton I*, 2010 WL 1460052, at *11.

court also cited other evidence that corroborated this testimony. It noted that Vollers and his brother had driven to Vollers' residence in a separate vehicle from the CPD officers, that Vollers was permitted to enter his home before they entered, and that he voluntarily took them to the garage (where he disclosed incriminating evidence about his own marihuana use) before directing them upstairs to the room where Newton was staying. *Id.* at *12.

The court also found that Vollers had actual authority to consent to the search of the guest room. Vollers owned the residence, he owned the furniture in the room, and the room contained his computer as well as memorabilia and football trophies that he had on display. Vollers commonly entered the room to use the computer when Newton was staying there. Further, Newton stayed at the residence as Vollers' guest when visiting town, not as a roommate or tenant. Newton did not pay rent, his name was not on the door to the room, he did not receive mail at that address, and he did not contribute to the upkeep of the dwelling. Nothing about Newton's rooming arrangement suggested that Vollers relinquished his right to enter this room, even if he felt that Newton could have privacy there. This indicated that he had actual authority to consent to the officers' entry. *Id.* The court also found that the officers reasonably believed that Vollers had such authority; they knew he was the owner of the residence, and they neither heard nor

saw anything that indicated that he lacked the authority to consent. *Id.*

The court concluded that the seizure of the two bags and the shoebox was permissible under the plain view doctrine. *Id.* at *13. The bags were beside the bed in plain view of the officers; the officers were in the room legally, pursuant to Vollers' consent; one bag was partially open and one was completely unzipped and open; and without disturbing the bags, officers could observe that one contained a large amount of U.S. currency and the other contained an electronic money counter. Given that IPD detectives had found a large amount of marihuana and drug notes in the apartment unit where Newton was encountered and in the black BMW, the incriminating nature of the currency and money counter—evidence or fruits of crimes—would have been apparent to the officers. The court concluded that the officers' seizure of these two bags was therefore proper. *Id.* Their subsequent search of the two bags was pursuant to a warrant that was based on probable cause, including the canine sniff. Newton presented no valid reason to conclude that the government could not rely on the good-faith exception for that search. Newton's motion was therefore denied as to the U.S. currency and the electronic money counter found in the two bags. *Id.* The court also denied Newton's motion as to the note containing descriptions of his drug activities. From their training and experience, detectives could

have determined that it described drug transactions. The plain view doctrine therefore also allowed the seizure of this evidence. *Id.*

With respect to the unopened duffel bag, the shoebox, the airline boarding pass, and the keys, the court held that the plain view doctrine could not apply because the incriminating nature of these articles was not immediately apparent. *Id.* at *13-14. But although evidence of the airline boarding pass and the keys was suppressed, the evidence found in the closed bag and the shoebox was not subject to suppression due to the operation of the independent source doctrine. *Id.* at *14. CPD eventually obtained a warrant for the bag and the shoebox and then searched both items. The government met its burden of showing that the affidavit, absent any illegally-obtained information, contained sufficient facts to constitute probable cause, and officers would have pursued the search warrant without the illegality. *Id.*

C

After the court denied Newton's suppression motion, he entered a conditional plea of guilty, reserving the right to appeal the court's ruling on his suppression motion.

In June 2010 police arrested Deloney and charged him with the offense of maintaining a drug-involved premises. During the investigation, the government learned that Vollers maintained an ongoing friendship and was in frequent contact with Deloney, a

suspected marihuana distributor. An informant also indicated that Vollers might be involved in drug distribution activities with Deloney. Although in prior interviews Vollers had been asked by law enforcement whether he knew of any other drug dealers, Vollers never identified Deloney. The investigation of Deloney also developed information that confirmed Vollers' continued association with Deloney and ongoing frequent contact in 2009 and 2010.

In July 2010 Deloney admitted that he was extensively involved in marihuana activities, that he and Vollers were close friends, that they were in frequent contact by telephone and in person, and that they had occasionally conducted marihuana transactions in the past, although before Vollers was arrested in the instant case. Deloney also stated that Vollers had helped him purchase cocaine for personal use between three to five times, most recently within the last few months.

Also in July, law enforcement met with Vollers and confronted him about Deloney. Vollers admitted that he and Deloney were close friends, that he knew Deloney was previously involved in dealing marihuana because the two had conducted marihuana transactions when Vollers was involved in the Newton drug-trafficking organization, that Vollers suspected that Deloney was still involved in marihuana distribution, and that he had helped Deloney obtain cocaine for personal use at least twice, which he estimated had occurred within the last year.

In September the government disclosed this information to Newton's counsel. Newton then filed the instant motion for reconsideration.

Newton contends that the court's decision to deny his suppression motion as it related to the evidence seized at Vollers' residence was based largely on the court's perception that Vollers' testimony was credible. He maintains that Vollers' admissions about his involvement with Deloney mean that he was involved in drug trafficking during the time he testified and at least up to the day of his admission to the government; that this revelation sheds light on the true nature of Vollers' lack of veracity and credibility; that when Vollers was debriefed and given the opportunity to identify other drug dealers, he gave untruthful statements and concealed his ongoing illicit drug transactions with Deloney; and that this new information should make the court pause and reconsider the evidence and testimony as it relates to Vollers' testimony at the suppression hearing. Newton asks that the court reconsider the suppression ruling as it relates to the search of Vollers' home and to any collateral matters to which Vollers' testimony related and that the court did not suppress.

The government responds by urging the court to apply the due process standards set out in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), specifically arguing that Newton has not shown that the government suppressed

evidence that is material or favorable to the defense.

II

A

> [C]ircuit precedent makes clear that the court is free at this pretrial stage to revisit its earlier pretrial ruling on the suppression motion. *See United States v. Palmer*, 122 F.3d 215, 221 (5th Cir. 1997) ("District courts hearing criminal cases may revisit pretrial issues, such as suppression motions, upon which they have previously ruled." (citing *United States v. Mentos*, 421 F.2d 215, 220 (5th Cir. 1970)); *United States v. Acosta*, 669 F.2d 292, 293 (Former 5th Cir. 1982) (per curiam) ("[T]he district court has broad power to reconsider the correctness of its interlocutory rulings." (citing *Lord v. Kelley*, 334 F.2d 742, 746 (1st Cir. 1964)); *United States v. Jones*, 608 F.2d 386, 390 (9th Cir. 1979) (noting that, within time for government's interlocutory appeal of suppression order, district court has plenary power to revisit its decision on suppression motion).

*United States v. Grazioso*, 2006 WL 2285585, at *4 (N.D. Tex. Aug. 9, 2006) (Fitzwater, J.), *aff'd,* 2008 U.S. App. LEXIS 6813 (5th Cir. Mar. 31, 2008).

B

Newton moves the court to reconsider the suppression ruling as it relates to the search of Vollers' home and any collateral matters to which Vollers' testimony related and that the court did not suppress. He posits that the court denied his suppression motion based largely upon the court's assessment that Vollers' testimony was credible. He cites the court's finding that "Vollers

testified credibly, however, that he voluntarily consented to the search of the room in which Newton's belongings were located." *Newton I*, 2010 WL 1460052, at *12.

The court denies Newton's motion because, even if the court takes into account the new information about Vollers' drug activities with Deloney, its ruling on Newton's suppression motion—particularly its findings that Vollers consented to the search of his residence and of the guest room—would be the same.

First, Newton does not point to specific suppression hearing testimony from Vollers that Newton contends was false. Instead, he argues that Vollers gave untruthful statements and concealed his ongoing illicit drug transactions with Deloney during debriefings by law enforcement; that Vollers' involvement with Deloney means that he was involved in drug trafficking during the time of his suppression hearing testimony; and that this information sheds light on the true nature of Vollers' lack of veracity and credibility and should make the court pause and reconsider the evidence and testimony as it relates to Vollers' testimony at the suppression hearing.

But the court was aware of issues involving Vollers' character, including his drug trafficking activities, when Vollers testified. Vollers had already entered into a plea agreement with the government in this case, and he was questioned during the hearing about the agreement and about his activities as a member of

Newton's drug-trafficking organization.  The court was also aware from the hearing testimony that the police believed that Vollers had been involved in unrelated illegal drug activities.  Sgt. Knack testified that Vollers was already being investigated prior to this incident, Tr. 1:185, and that there had been a prior investigation of Vollers' residence, *id.* at 196.  And Newton does not cite any part of Vollers' hearing testimony that he contends reflects Vollers' attempt to assert or create the impression that he was no longer involved in drug activities at the time he testified in court.

Second, Vollers was not the only witness who testified that he voluntarily consented to the search of his house and the guest room.  Sgt. Knack testified that, while he and Sgt. Lujan were talking to Vollers in Sgt. Lujan's truck, they asked him if they had his consent to go to his residence and conduct a search, and Vollers agreed.  *Id.* at 171.  Vollers was not under arrest or handcuffed, and the officers did not have their weapons drawn, and Vollers was not threatened with arrest if he did not give his consent.  *Id.*[2]  It appeared to Sgt. Knack that Vollers had freely and voluntarily given his consent to enter his house.  *Id.* at 172. Sgt. Knack's report also indicated that Vollers allowed Sgts. Knack and Lujan to follow him to his residence to conduct a voluntary

---

[2]Sgt. Lujan testified that they did tell Vollers that they would probably seek a warrant if he did not consent to the search of his residence.  Tr. 2A:13.

consent search of the residence, and it corroborates Sgt. Knack's testimony that Vollers gave his consent. *Id.* at 193. Sgt. Knack did not contemplate getting a warrant to search the residence because Vollers had "willingly giv[en] consent." *Id.* at 195. Sgt. Knack testified unequivocally that "Mr. Vollers gave us consent to search the room." *Id.* at 203. In fact, he testified that Vollers consented to a search of the guest room *a second time*, after the officers had departed the residence and sought to return to retrieve a shoebox that they had not taken with them initially, having discovered evidence connecting the shoebox to drug activities.

Third, Vollers' testimony was corroborated by his actions. According to Sgt. Knack, when the officers arrived at Vollers' residence, he allowed them in and directed them to the garage, where a small quantity of marihuana was located. *Id.* at 172. Vollers then directed the officers upstairs to the guest room, where he pointed out several bags that he advised belonged to J.P. *Id.* According to Sgt. Knack, Vollers "basically brought us up there" to the room. *Id.* at 173; *see also id.* ("[H]e brought us up there[.]"); *id.* at 200 ("[H]e pointed us to the room. . . . He brought us in and said here's the room."); *id.* at 202 ("So he brought us up and said here's the room."). This is conduct that is fully consistent with consent to search the residence and guest room. Even if Vollers had not testified at the hearing that he

gave his consent, the testimony of other witnesses, combined with Vollers' actions, support the court's finding that Vollers consented to the searches.

Fourth, the court relied on more than Vollers' testimony in finding that he had consented. After finding, as Newton points out, that Vollers testified credibly, the court relied on the following:

> Among other things, Vollers and his brother drove to his residence in a separate vehicle from the CPD officers, he was permitted to enter his home before they entered, and he voluntarily took them to the garage (where he disclosed incriminating evidence about his own marihuana use) before directing them upstairs to the room where Newton was staying.

*Newton I*, 2010 WL 1460052, at *12.

Fifth, the court concluded in *Newton I* that the police had reasonably relied on Vollers' apparent authority to consent to the search. *Id.* ("Additionally, the officers reasonably believed he had such authority; they knew he was the owner of the residence, and they neither heard nor saw anything that indicated that he lacked the authority to consent.").

> In order to satisfy the consent exception, the government must establish that consent to search was freely and voluntarily given and that the individual who gave consent had authority to do so . . . . When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained from a third party, rather than from the person whose property was searched or seized, the government bears the burden of proving that the third party had either actual

> or apparent authority to consent . . . . To establish that a third party had apparent authority to consent, however, the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent.

*United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997) (citations omitted).

Sgt. Lujan testified that "I believe[d] that Mr. Vollers had authority to give us consent for his house." Tr. 2A:19. And he testified that the officers believed that Vollers had the authority to consent to their entry into the guest room.

> Q. When you made entry into that room did you believe that Kurt Vollers had the authority to permit you to enter that room?
> A. Yes.
> Q. Based on what?
> A. He was the owner of the house.
> Q. What else?
> A. And he — — he just gave us consent and he said this is my house and I have full authority over the home.

*Id.* at 25.

Even if the court were now to discredit Vollers' testimony that he consented to the search of his residence and the guest room, this would not undercut the finding that the officers validly entered the residence and the guest room based on Vollers' apparent authority to consent. Sgt. Knack testified regarding the apparent voluntariness of Vollers' consent and stated that nothing from Vollers indicated that he did not have the authority to permit the officers to enter the guest room. Tr. 1:176. Moreover, even

without Vollers' testimony, the court finds that the officers reasonably believed that Vollers had the authority to consent. Vollers had already consented to a search of the residence, the guest room was a room within the residence, Vollers kept his personal property in the guest room, and Vollers would frequently enter the guest room to use his computer.

Accordingly, even considering the new information on which Newton relies, the outcome of the court's suppression ruling would not change. This would be the result even were the court to reopen the suppression hearing and, after hearing the new information about Deloney, find that Vollers' testimony generally, or specifically regarding his consent, was not credible. Vollers' conduct (to which others testified) and the testimony of other credible witnesses establishes that Vollers consented to the search of his residence and the guest room. And the officers reasonably relied on his apparent authority to consent.

* * *

For the reasons set forth above, the court denies Newton's October 1, 2010 motion for reconsideration of the court's memorandum opinion and order denying defendant's motion to suppress.

**SO ORDERED**.

October 28, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE